IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DEMARKAS S. KING,

        Petitioner,            No. CIV S-08-1524 GEB DAD P

    vs.

ANTHONY HEDGPETH,

        Respondent.        <u>FINDINGS & RECOMMENDATIONS</u>

_____/

        Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2005 conviction in the Sacramento County Superior Court on charges of second degree murder and attempted murder with enhancements for use of a firearm in connection with those offenses. Petitioner is serving a sentence of seventy-five years to life in prison pursuant to that judgment of conviction. Petitioner seeks federal habeas relief on the following grounds: (1) his right to due process was violated by juror misconduct at his trial; (2) his appellate counsel rendered ineffective assistance in failing to raise the juror misconduct issues on appeal; and (3) his right to due process was violated by the giving of erroneous jury instructions at his trial. Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

1

## PROCEDURAL AND FACTUAL BACKGROUND

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal[1], the California Court of Appeal for the Third Appellate District provided the following factual summary:

> A jury found defendants Demarkas S. King, Ralph E. King, and Kenneth McClish not guilty of first degree murder, but guilty of second degree murder in the killing of Allen Qualls (count 1; Pen.Code, § 187, subd. (a); undesignated statutory references are to the Penal Code), and of the attempted murder of Michael Washington (count 2; §§ 664/187, subd. (a)).[2]  The jury also found that Ralph and McClish were felons in possession of a firearm (counts 3 & 4; § 12021, subd. (a)(1)).[3]  The jury further found as to counts 1 and 2 that Demarkas personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)), that McClish personally used a firearm (§ 12022.53, subd. (b)), and that all defendants were armed in the commission of the offenses (§ 12022, subd. (a)(1)).  The trial court found thereafter that McClish had two prior convictions for serious felonies (§§ 667, subds.(a), (b)-(i)) and had served three prior prison terms (§ 667.5, subd. (b)).  All defendants received life terms in state prison.
>
> Ralph and McClish contend there is insufficient evidence to support their convictions on counts 1 and 2.  Demarkas contends the trial court misinstructed the jury as to second degree felony murder, the intent required for second degree murder, imminent danger, imperfect self-defense, and aider and abettor liability; McClish raises a separate objection to the instruction on the last point.  All defendants join in each others' contentions so far as applicable to themselves.
>
> Rejecting all of defendants' contentions, we shall affirm.  However, we have detected errors in the abstract of judgment as to McClish and shall remand the matter to the trial court with directions to correct the errors.

/////

/////

---

[1]  Notice of Lodging Documents on June 25, 2009 (Dkt. No. 23), Resp't's Lod. Doc. No. 5 (hereinafter Opinion).

[2]  To avoid confusion, we refer to Demarkas King and Ralph King (son and father respectively) by their first names.

[3]  At trial, the parties stipulated that both defendants were convicted felons.

2

**FACTS**

In August 2003, Demarkas, his wife Tamica, and their small daughter lived on Sky Parkway in Sacramento County. Ralph and McClish lived in separate apartments at 5218 Martin Luther King Boulevard in the City of Sacramento, a bit north of Fruitridge Road; McClish lived with his girlfriend Lisa Knestrict and her aunt Betty Patterson, among others. Ralph's and McClish's building was about 600 feet from a Taco Bell at the corner of Martin Luther King Boulevard and Fruitridge Road; an open field separated the two buildings.

On August 17, 2003, sheriff's deputies came to Demarka's apartment in response to a call. Tamica said that Demarkas, who was not there, had been in a fight. Demarkas did not contact the authorities. He later told the police, however, that after he heard banging on his front door and opened it, Michael Washington and others burst in and beat him up, then left.

According to Thomas Ogle, Jr., the 17-year-old stepbrother of Tamica, while visiting the King family in the summer of 2003 he saw Ralph buy a black semiautomatic handgun, then later show it to Demarkas. In a police interview Ogle said the purchase took place the weekend before the charged crimes, but he testified that it might have been around July 4 because he remembered the Kings had had a barbecue.

According to Betty Patterson, on August 19, 2003, she overheard Demarkas and Ralph talking outside Ralph's building. Demarkas said the police had learned of the assault on him but did nothing. Ralph said he did not want his family treated like that.

On the morning of August 20, 2003, Patterson overheard Demarkas and Ralph talk about getting a gun. Ralph told Demarkas: "We have one gat, and we need another one." Demarkas said he knew where to get another one. Ralph said he would not let his family be disrespected, and Demarkas's attackers "didn't know who they were dealing with."

Before August 20, 2003, Patterson heard McClish tell boys in the building that he had a gun; the boys later told Patterson they had seen it. McClish's girlfriend Lisa Knestrict testified that in July 2003 she discovered a black gun under the mattress on McClish's side of the bed and told him to get rid of it; he said he would.[4]

/////

---

[4] McClish was arrested on August 26, 2003. He told Knestrict before his arrest that his brother Rick had removed the gun from the apartment, but Knestrict was not sure whether McClish said so before or after the date of the crimes.

Patterson told the police that she saw McClish's brothers remove a gun from under his mattress on August 25. At trial, however, she testified she heard this had happened but did not see it.

At 10:21 p.m. on August 20, 2003, Demarkas called the sheriff's department from work to report that someone was kicking his apartment door while his wife was at home. The department responded to the call at 10:56 p.m., but found no evidence of a crime and left without filing a report.

According to Patterson, McClish told her on the night of August 20 that Demarkas had called and would come over. Demarkas arrived around 11:00 p.m. and asked Patterson if McClish was home. As Patterson sat on a bench outside, she overheard Demarkas tell Ralph that "the guys were at Taco Bell" and "[w]e need to get over there now." Demarkas went upstairs and came back down with McClish, who carried a gray sweatshirt rolled up under his arm.[5] Patterson and Jermal Lee, a teenage resident of the building, saw Demarkas or Ralph walking with McClish at the rear of the building.

At around 11:30 p.m., Michael Washington and Allen Qualls were sitting in a primer-gray 1972 Chevrolet Nova in the Taco Bell drive-through at Martin Luther King Boulevard and Fruitridge Road. Qualls was the driver, Washington the passenger.

Taco Bell employees and customers saw a man walk up to the Nova's passenger side, appear to speak, then pull out a black long-barreled gun and fire into the car. A second man was standing in the drive-through lane two cars behind the Nova. After pausing and looking back at him, the shooter fired more shots into the Nova. The two men then hopped over a concrete wall behind the restaurant.

Eyewitnesses subsequently identified the shooter in photo line-ups and in court as Demarkas. They could not identify the second man, but described him as a heavy-set Black man around 5 feet 8 or 9 inches tall; two witnesses said he was wearing light or khaki shorts.[6]

The Nova pulled into a nearby gas station, where Qualls collapsed. Taken to University of California at Davis Medical Center, he was declared dead from a gunshot wound to the abdomen. Washington was operated on for lung damage from a gunshot that struck him in

---

[5] Knestrict fell asleep that night at 9:30 p.m. She heard someone come to the door asking for McClish, who left the bedroom. McClish told her later it was Demarkas who had come to the door.

[6] The police later found khaki shorts and a gray sweatshirt in McClish's bedroom. At the time of the crimes, McClish, who stood 5 feet 9 inches tall, weighed 225 pounds.

4

the back and shoulder.

Investigating officers found six spent shells near the drive-through window and a projectile and bullet fragments inside the Nova. Another projectile was removed from Washington during surgery. A ballistics expert opined that the shells and projectiles were fired from the same nine-millimeter gun, at least some while the Nova was moving forward.  No weapons or ammunition were found in the Nova.[7]

Betty Patterson and Jermal Lee, in separate positions outside their building, heard four or five shots from the direction of the Taco Bell.  Patterson then saw three people climbing over a fence, heading toward the building from the nearby field.  She recognized Ralph and Demarkas; the third, whose face she could not see, was wearing a gray sweatshirt like the one McClish had on when Patterson saw him in his bedroom soon after.

According to Patterson, Ralph took a handgun out of his waistband and unloaded some shells, while saying, "We do this gangsta style."  Ralph then said he was going to have a drink to calm his nerves and headed to his apartment.  In subsequent days he repeated that he would not let anyone disrespect his family.

Lee testified, as he had told an investigator for the district attorney's office, that after hearing shots he saw Ralph and McClish walking from the field toward the building, then saw Ralph unload the gun as he said, "They should not mess with my family."  However, Lee also testified, as he had told McClish's former attorney, that McClish was with him outside the building when the shots were fired, and it was Ralph and Demarkas whom Lee saw coming toward the building.

After the shooting, Demarkas drove to Oakland, then to San Diego. He crossed the border into Mexico, but was arrested on a murder warrant as he tried to reenter the United States.

In custody, Demarkas was interviewed on videotape on August 28, 2003, by Sheriff's Detective Charles Husted.  Portions of the interview were played for the jury.

During the interview, after claiming ignorance of the crimes, Demarkas admitted he shot Washington (whom he called "Nova Mike") because he was "fed up" with Washington for threatening him and for assaulting him in his home.  He had aimed only at Washington and did not know who else was in the Nova.  He had

---

[7]  The police found baggies of marijuana in a paper bag in the car and $700 in cash on Washington.  The prosecutor suggested Washington had been planning to sell marijuana at the Taco Bell.

gotten the nine-millimeter handgun from his father's home after
spotting Washington driving past.

After Demarkas testified, the prosecution played other portions of
his interview, which implicated the codefendants.  Demarkas told
Detective Husted that Ralph was standing at the concrete wall
separating the Taco Bell from a day care center when Demarkas
shot Washington, and McClish (whom Demarkas called "Uncle
Ken") was in the drive-through area at the time.  Ralph and
McClish were present as Demarkas ran through the field to their
building after the shootings; he gave the gun to Ralph en route.
Demarkas knew McClish had a sawed-off .22-caliber rifle, but did
not know if he had taken it to the Taco Bell.

The prosecution also played portions of a taped interview of Ralph
made on August 23, 2003, the date of his arrest.  Ralph claimed he
was walking across the field trying to catch up to Demarkas when
the shots were fired.  But later Ralph admitted he had followed
Demarkas to the wall behind the Taco Bell, pulled himself up to
look over it, and seen Demarkas standing by the Nova.  Ralph saw
Demarkas extend his arm toward the Nova, then heard three or four
shots.

After the interview, Ralph and Detective Husted went to the field
and Ralph pointed out where he had climbed the fence.  He also
pointed out a water pipe he had stood on at the base of the
seven-foot-high concrete wall, allowing him to peer over its top.

**Demarkas's defense**

Relying mainly on his own and his wife's testimony, Demarkas
tried to prove that he acted alone out of provocation or in defense
of himself and others.

Tamica testified that on August 17, 2003, she heard fighting
downstairs, then saw Demarkas getting up off the floor as
Washington and another man ran out.  Demarkas had a black eye
and bruises the next day.

On August 20, according to Tamica, she heard banging at her front
door and at the back of the apartment.  She called Demarkas at his
job.  He told her to get a gun out from under a couch cushion
downstairs; she put it under her pillow in the bedroom.  Demarkas
returned around 10:30 p.m. with Ralph.  The family decided to
spend the night at Ralph's building, where Tamica's mother also
lived.

Tamica testified that as she went up to her mother's apartment,
Demarkas and Ralph stayed downstairs.  She heard shots.
Demarkas later came into her mother's apartment and told Tamica:
"I just killed them [both]."  Demarkas went to Ralph's apartment,

6

then drove off in Ralph's Ford.  She saw and spoke to him the next day in the Oakland area.[8]

In Oakland he told her McClish had accompanied him to the Taco Bell. Ralph had joined them en route; though he could not climb over the wall, he got in position to see over it.  Ralph had instigated Demarkas's actions, saying, "You got to do what you got to do."  Both Demarkas and McClish had had guns that night. Demarkas testified that he and Washington had been friends, but in the summer of 2003 Washington inexplicably turned against him. After repeatedly threatening in public to beat him up, Washington came to Demarkas's home and attacked him when he opened the door.  Washington was accompanied by at least two people who forced their way in and joined in the attack.  Washington also kicked Demarkas's six-year-old daughter to the floor.  Afterward, Demarkas walked to Ralph's place and told him he had been attacked by "Nova Mike and his partner."  His eye was swollen and discolored, and his pain forced him to miss a day of work.  That day, he retrieved a loaded gun from his father's place.

On the evening of August 20, hearing at work from Tamica that "those guys came back" and were pounding on the door, Demarkas advised her to get the gun, take it upstairs, and lock the door.  He called the police, describing Washington and the Nova; then he called Ralph to get a ride home from work.  He reported his prior beating to the officers when he got home and showed them footprints and dents on the door, but they said they could do nothing because the culprits had fled.

After they left, according to Demarkas, he got the gun Tamica had taken upstairs and put it in his pants pocket.  He told his family to ride with Ralph to Ralph's building while he drove there separately.  Spotting the Nova in the Taco Bell parking lot, then seeing Washington and others standing near it, Demarkas decided to walk over there armed without telling Ralph.

According to Demarkas, he crossed the field alone, jumped a fence, and climbed a concrete wall at the back of the Taco Bell site. Walking up to the Nova, he called Washington's name; Washington smirked and turned away.  It looked as though he was reaching for something.  Stepping back and feeling scared, Demarkas heard a "loud pop," then "just jumped back and pulled my gun and started firing."  He returned to Ralph's building the way he had come, dropping his gun as he ran through the field.  He

---

[8]  On cross-examination, Tamica said she saw Demarkas look toward the Taco Bell as he was driving to Ralph's building.  When they reached the building, he said to her: "Them niggas' [sic] are at Taco Bell."  Ralph told her after the fact that he had handed Demarkas a gun. Demarkas admitted after the fact he had fired into the Nova "to kill them."

7

saw Ralph walking along Martin Luther King Boulevard.

According to Demarkas, as he returned to the building, Tamica and McClish approached him.  He told Tamica and her mother what he had done, then went to Ralph's apartment and told him.  Ralph gave him some clothes and loaned him a car to drive to Oakland.  After Tamica visited him there, he drove to Mexico, then was arrested while trying to reenter the United States.[9]

**Ralph's defense**

Ralph did not testify, but tried to prove he did not participate in the crimes and could not have done so.

A chiropractor who treated Ralph for a back injury incurred on July 23, 2003, testified that Ralph had "moderate to severe problems" with movement.  (The parties stipulated that Ralph had also undergone back surgery following a workplace injury 20 years before.)  The chiropractor conceded, however, that thanks to his treatments Ralph "most likely" could have climbed a five-foot-high fence by August 20, 2003.

Ralph's girlfriend testified she spent the evening of August 20, 2003, with him, celebrating her birthday and helping him unpack in the new apartment he had just moved into from another one in the building.  According to her, he got a phone call and left his apartment around 10:30 p.m., then returned 30 to 45 minutes later; however, she never saw him with a gun that night.

**McClish's defense**

McClish also did not testify but tried to refute evidence of his involvement.  Othello Chase testified that he had given McClish a .22-caliber sawed-off rifle as collateral for a loan, but reclaimed it three or four weeks before the shootings.[10]  McClish's brother Rodney testified that, contrary to Betty Patterson's account, he did not remove a gun from under McClish's bed on August 25, 2003, and could not have done so because he was in Green Bay, Wisconsin, visiting his children that week; the children's mother

---

[9]  On cross-examination, Demarkas denied that Ralph and McClish had gone with him to the Taco Bell, that Ralph had given him a gun and encouraged him to shoot Washington, that he had called McClish and gone to his apartment that night, that he had asked McClish to come as a back-up, and that he had given the gun to Ralph after the shootings.  He also denied that he had told Detective Husted anything different.  He admitted, however, that he had lied to Husted on a number of points.  He also admitted he did not see a gun inside the Nova at the time of the shootings, and shot at the car as it was moving.

[10]  Chase also testified, however, that he gave the gun to McClish 45 days before the shooting and McClish had it for about a month and a half.

corroborated that testimony.[11]  To rebut Patterson's claim she saw McClish carrying a wrapped-up sweatshirt on the night of the crimes, he played a portion of a taped interview in which she seemed to say she had merely heard others alleging this.

Petitioner appealed from his conviction to the California Court of Appeal for the Third Appellate District.  On October 19, 2006, the judgment of conviction was affirmed. (Resp't's Lod. Doc. 5.)

On November 20, petitioner filed a petition for review with the California Supreme Court.  (Resp't's Lod. Doc. 6.)  On February 7, 2007, the California Supreme Court summarily denied the petition for review.  (Resp't's Lod. Doc. 7.)

On September 13, 2007, petitioner filed a petition for writ of habeas corpus in the Sacramento Court of Appeal, raising claims of juror misconduct and ineffective assistance of appellate counsel.  (Resp't's Lod. Doc. 8.)  On September 20, 2007, the California Court of Appeal summarily denied that petition.  (Resp't's Lod. Doc. 9.)

On October 15, 2007, petitioner filed a habeas petition in the California Supreme Court, raising the same claims that he raised in his habeas petition filed in the California Court of Appeal.  (Resp't's Lod. Doc. 9.)  On August 23, 2007, the Supreme Court denied that petition with a citation to People v. Duvall, 9 Cal.4th 464, 474 (1995).  (Resp't's Lod. Doc. 11.)

On July 2, 2008, petitioner filed his federal habeas petition.  (Dkt. No. 1.) Respondent filed an answer on February 18, 2009.  (Dkt. No. 18.)  On June 5, 2009, petitioner filed a motion for leave to file a first amended petition and a late "reply" to respondent's answer, along with his amended petition and reply.  (Dkt. Nos. 19, 20, 21.)  On March 19, 2010, this court granted petitioner's motion, deemed the amended petition to be the operative pleading in this matter, and granted respondent leave to file either an amended answer or a surreply brief

---

[11]  On cross-examination, the prosecutor played the tape of a jail phone call McClish placed to his mother and Lisa Knestrict on August 26, 2003, in which Knestrict says Rodney is "right here."  Rodney claimed "right here" meant in Green Bay on a three-way connection.

9

1   within forty-five days.  (Dkt. No. 24.)  Respondent filed an amended answer on May 3, 2010.

2   (Dkt. No. 25.)

3                                                    ANALYSIS

4   I.  <u>Standards of Review Applicable to Habeas Corpus Claims</u>

5                  A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

6   some transgression of federal law binding on the state courts.  <u>See</u> <u>Peltier v. Wright</u>, 15 F.3d 860,

7   861 (9th Cir. 1993); <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing <u>Engle v.</u>

8   <u>Isaac</u>, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the

9   interpretation or application of state law.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991);

10  <u>Park v. California</u>, 202 F.3d 1146, 1149 (9th Cir. 2000); <u>Middleton</u>, 768 F.2d at 1085.  Habeas

11  corpus cannot be utilized to try state issues <u>de novo</u>.  <u>Milton v. Wainwright</u>, 407 U.S. 371, 377

12  (1972).

13                 This action is governed by the Antiterrorism and Effective Death Penalty Act of

14  1996 ("AEDPA").  <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997); <u>Clark v. Murphy</u>, 331 F.3d

15  1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting

16  habeas corpus relief:

17                      An application for a writ of habeas corpus on behalf of a
                    person in custody pursuant to the judgment of a State court shall
18                  not be granted with respect to any claim that was adjudicated on
                    the merits in State court proceedings unless the adjudication of the
19                  claim -

20                      (1) resulted in a decision that was contrary to, or involved
                    an unreasonable application of, clearly established Federal law, as
21                  determined by the Supreme Court of the United States; or

22                      (2) resulted in a decision that was based on an unreasonable
                    determination of the facts in light of the evidence presented in the
23                  State court proceeding.

24  <u>See also</u> <u>Penry v. Johnson</u>, 532 U.S. 782, 792-93 (2001); <u>Williams v. Taylor</u>, 529 U.S. 362

25  (2000); <u>Lockhart v. Terhune</u>, 250 F.3d 1223, 1229 (9th Cir. 2001).  If the state court's decision

26  does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review

                                                          10

1   of a habeas petitioner's claims.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008).  See

2   also Frantz v. Hazey, 513 F.3d 1002, 1013 (9th Cir. 2008) (en banc) ("[I]t is now clear both that

3   we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such

4   error, we must decide the habeas petition by considering de novo the constitutional issues

5   raised.").

6           The court looks to the last reasoned state court decision as the basis for the state

7   court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  If the last reasoned

8   state court decision adopts or substantially incorporates the reasoning from a previous state court

9   decision, this court may consider both decisions to ascertain the reasoning of the last decision.

10  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  Where the state court

11  reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

12  habeas court independently reviews the record to determine whether habeas corpus relief is

13  available under § 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Pirtle v.

14  Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  When it is clear that a state court has not reached

15  the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's

16  deferential standard does not apply and a federal habeas court must review the claim de novo.

17  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

18  II.  Petitioner's Claims

19      A.  Juror Misconduct

20          Petitioner claims that juror misconduct violated his right to a fair trial.  He

21  describes his claim as follows:

22          Juror misconduct: juror number 7 concealed during voir dire that
            he was the victim of the crime of child molestation and brought
23          into deliberations extraneous outside information from his own
            experience at a different "Taco Bell"; juror number 4 concealed
24          information that she had a working relationship with and
            communication from a [member] of one of the victims (Qualls)
25          family [members] until after the trial."

26  (Am. Pet. filed June 5, 2009 (hereinafter Am. Pet.) at 6(a).)

1        Petitioner's claims regarding Juror #4 and his claim that Juror #7 brought

2  extraneous information into the jury room were raised for the first time in petitions for a writ of

3  habeas corpus filed by petitioner in the California Court of Appeal and the California Supreme

4  Court.  (Resp't's Lod. Docs. 8, 10.)  In support of his allegations, petitioner attached a

5  declaration by Juror #4, in which she made various allegations about the conduct of petitioner's

6  trial.  (<u>Id.</u>, Ex. A.)  The California Court of Appeal rejected these claims brought by petitioner on

7  the merits.  (Resp't's Lod. Doc. 9.)  The California Supreme Court denied petitioner's

8  application for habeas relief in which these claims were raised with a citation to <u>People v.</u>

9  <u>Duvall</u>, 9 Cal.4th 464, 474 (1995).  (Resp't's Lod. Doc. 11.)[12]

10        Respondent argues that these claims have not been exhausted in state court

11  because they were rejected by the California Supreme Court on a procedural ground with a

12  citation to the decision in <u>Duvall</u> reflecting that petitioner may not have stated his claims with

13  sufficient particularity.  (Answer at 10-13.)  In addition to raising an exhaustion defense,

14  respondent urges that relief with respect to these claims be denied on the merits.  (Answer at 13-

15  28.)

16        The court may deny a federal habeas corpus claim on the merits notwithstanding a

17  petitioner's failure to exhaust state court remedies.  <u>See</u> 28 U.S.C. § 2254(b)(2).  Assuming

18  arguendo that petitioner's claims of juror misconduct have not been exhausted, for the reasons

19  explained below this court will recommend that relief be denied on the merits.  Because the

20  California Supreme Court rejected petitioner's arguments on procedural grounds, this court will

21  review the claims of juror misconduct de novo.  <u>Nulph</u> 333 F.3d at 1056.

22  /////

23  /////

24

25        [12]  Petitioner's allegation that during jury selection Juror #7 had concealed the fact that he

26  had been the victim of child molestation does not appear to have been presented to any California
    court.

1        1.  <u>Background</u>

2            The state court record reflects that a questionnaire given to jurors during voir dire

3   asked, among other things, whether they or anyone close to them had ever been a witness to or

4   the victim of a crime.  (Resp't's Lod. Doc. 23 at 148-49.)  Juror #7, the foreperson, responded

5   that in 1996 his car was stolen and that he had never been a witness to a crime.  (<u>Id.</u>)  Another

6   question on the form asked whether the juror or anyone close to him/her had "ever had a

7   memorably good or bad experience with a law enforcement officer?"  (<u>Id.</u> at 150.)  Juror #7

8   responded to this question by writing "personal," which indicated that he wished to discuss this

9   issue privately with the trial judge.  (<u>Id.</u>)  Several days later, the trial judge questioned Juror #7

10  individually about the matter he wished to discuss privately.  (Resp't's Lod. Doc. 24 at 93-94.)

11  Juror #7 told the judge that he was "trying to remember" why he had marked "personal" on the

12  form, and finally explained that after his car was stolen in 1996, the police officer remained with

13  him while he waited for a tow truck.  (<u>Id.</u>)  He further stated that the incident would not cause

14  him to favor the testimony of police officers.  (<u>Id.</u> at 94.)

15          On May 18, 2005, the day after the verdicts were announced, Juror #7 contacted

16  the prosecutor and informed him that, although he had forgotten when he was questioned by the

17  trial judge why he had answered "personal" on the juror questionnaire, he later recalled that what

18  he had actually wanted to discuss was that when he was thirteen years old he had been molested

19  by a school bus driver.  (Resp't's Lod. Doc. 21 at 111-12.)  Juror #7 informed the prosecutor that

20  "it was both a good and bad experience" because, although he was forced to report the conduct,

21  the bus driver later admitted the conduct.  (<u>Id.</u> at 112.)  He explained that when he was called in

22  to talk to the trial judge about his answer on the questionnaire, he was surprised to see all of the

23  attorneys and defendants in the room and suddenly could not remember what he had wanted to

24  discuss in private.  (<u>Id.</u> at 111.)  Juror #7 further stated that he thought about reporting his

25  recollection of the incident to the court, but decided that "it did not seem significant to the issues

26  in the case."  (<u>Id.</u>)  He also stated that the prior incident "did not affect his judgment in this case."

13

1  (Id.)  The prosecutor informed all defense counsel about his conversation with Juror #7 in a letter

2  dated May 20, 2005.  (Id. at 111-12.)

3         On May 27, 2005, petitioner filed a motion for new trial.  (Id. at 100-17.)

4  Attached to the motion was the May 20, 2005 letter from the prosecutor outlining his

5  conversation with Juror #7.  (Id. at 111-12.)  Also attached was a declaration from Juror #4.  (Id.

6  at 109-10.)  Therein, Juror #4 declared that: (1) prior to deliberations she had discussed the facts

7  of the case with the sole alternate juror; (2) the fact that Michael Washington was not called as a

8  witness was discussed during deliberations; (3) Jurors #5, #7, and #8 performed improper

9  experiments during the jury viewing of the crime scene and discussed those experiments during

10  deliberations; (4) Juror #7 discussed his own experience at another Taco Bell during

11  deliberations; (5) her request to view the jury forms was denied by jurors #7 (the jury foreman)

12  and #1, and the verdicts read aloud by the court clerk were not "correct as agreed by the jury;" (6)

13  she discussed the facts of the case with Juror #2 outside the presence of the other jurors; and (7)

14  she recognized a family member of the victim during the trial, which "affected [her] ability to sit

15  as a fair and impartial juror."  (Id.)

16         The prosecutor filed an opposition to the motion for new trial on June 7, 2005.

17  (Resp't's Lod. Doc. 22 at 1725.)  Attached to the opposition was the declaration of Juror #7, who

18  stated that: (1) after one of the other jurors asked why Michael Washington was not called as a

19  witness, he told the juror that "we could not discuss that fact;" (2) the only experiment conducted

20  at Taco Bell was when the jurors stood on a pipe alongside a cement wall, in the location where

21  Ralph King had allegedly been standing while the crime took place, to see what was visible of

22  the drive-through window where the shooting occurred; (3) at one point during deliberations,

23  Juror #7 told the other jurors that once when he was at a Taco Bell drive-through late at night, he

24  observed two teenagers "running up to the drive through area and enter a car immediately behind

25  me in the drive through lane;" and (4) Juror #4 was not denied the opportunity to view the verdict

26  forms, and "all twelve jurors agreed upon the verdicts, which were the verdicts stated in court."

1   (Id. at 1745-47.)  Also attached to the prosecutor's opposition brief was the declaration of Juror

2   #1, who stated that: (1) the issue of Michael Washington being called as a witness was

3   mentioned "only in the context that we could not speculate as to the reason why he was not called

4   as a witness;" (2) although Juror #7 mentioned that he saw someone walk up to the drive through

5   lane at a Taco Bell late at night, "he never linked that observation to the facts of this case and we

6   never discussed his observations any further; (3) Juror #4 was not denied the opportunity to

7   review the verdict forms; and (4) "the verdicts as read aloud by the court clerk were correct and

8   were the verdicts the jury unanimously agreed upon in this case."  (Id. at 1742-43.)

9          The trial court conducted a three day hearing on petitioner's motion for new trial.

10  (Resp't's Lod. Doc. 19 at 2650, et seq.)  The judge first addressed the allegation of Juror #4 that

11  she was not allowed to review the jury verdicts and that the verdicts read in court were not

12  agreed upon by the jury as a whole.  (Id. at 2650.)  The judge noted that the verdicts were read to

13  the jury in open court; that the jurors were polled on whether the verdicts were what had been

14  agreed to; and that all jurors, including Juror #4, agreed that "that was their verdict."  (Id.)

15  Because the verdicts were recorded and therefore "complete" under California law, the trial court

16  rejected petitioner's argument that he should be granted a new trial because the verdicts were not

17  what the jury had agreed to.  (Id. at 2651.)

18         The trial court also concluded that the jurors' discussion about the fact that

19  Michael Washington was not called as a witness did not result in prejudice to the defendants

20  because the jurors had been instructed that the parties need not produce all witnesses and

21  evidence suggested by the evidence.  (Id.)  Accordingly, petitioner's motion for new trial on this

22  ground was denied as well.  (Id.)  Next, the trial judge addressed Juror #4's allegation that Juror

23  #7 discussed his experiences at a different Taco Bell during the deliberations on this case.  (Id.)

24  The judge concluded that Juror #7's remarks about what he had observed at another Taco Bell

25  drive-through line concerned merely a "life experience," and that they "did not rise to the level

26  where it prejudiced these defendants in any regard nor did it bring in any independent,

15

1  extraneous, relevant and material information that would deny these defendants of fair trial

2  rights."  (Id. at 2652.)

3          The trial court also concluded that the conduct of the jurors at the crime scene

4  when they looked at the Taco Bell from the location where Ralph King was standing was not

5  inappropriate because it was "a view of the scene that was within the range of evidence;" it was

6  appropriate to discuss during deliberations what the jury had seen at the crime scene; and there

7  were no actual "experiments" conducted in the jury room during deliberations.  (Id. at 2652-53.)

8  Accordingly, the court denied the motion for new trial with respect to petitioner's argument that

9  the jurors conducted improper experiments in the jury room or at the crime scene.  (Id. at 2653.)

10          The trial court also addressed Juror #7's failure to disclose that he had been

11  molested by a truck driver when he was 13 years old.  The judge noted that the molestation was

12  "not the type of crime that [the defendants] are charged with;" he found that "there is no

13  relationship in terms of materiality," and "it happened when [Juror #7] was youthful;" and he

14  concluded that he was "impressed from the affidavits that it is an unintentional concealment and

15  unintentional nondisclosure that wouldn't reflect a state of mind that would prevent him from

16  acting impartially."  (Id. at 2677-78.)  Accordingly, the motion for new trial on the ground that

17  Juror #7 committed misconduct when he failed to reveal this incident during voir dire was also

18  denied.

19          The trial judge then conducted a hearing on the other matters contained in the

20  affidavit of Juror #4.  In this regard, the court heard testimony from ten jurors, including Juror #4

21  and the sole remaining alternate juror.

22          Juror #4 testified that the main focus of her conversations with Juror #2 concerned

23  the fact that she recognized Sheila Qualls, a family member of Allen Qualls, when Ms. Qualls

24  attended the trial for part of one day.  (Id. at 2657-62.)  Ms. Qualls ran out of the courtroom

25  crying and Juror #4 saw her in the hallway and in the elevator.  (Id.)  She recognized Ms. Qualls,

26  and believed that Ms. Qualls recognized her, but she could not place Qualls' name until the next

16

day. (Id.)  She stated that she worked with Sheila Qualls for two or three years at the Sacramento

Bee approximately six years before and that, while they "weren't that close," she "liked her a

great deal."  (Id. at 2657-58, 2664.)  She also stated that she was Qualls' "union rep, and I helped

her with salary issues."  (Id. at 2662.)  With respect to the impact that it had on her when she saw

Ms. Qualls, Juror #4 explained

> Yeah, it affected me that there was a face now.  There was an
> obligation, I felt, to consider the family's loss, and it really
> bothered me, and that was, I feel, the biggest boo boo . . .

(Id. at 2658.)  She stated that after she saw Ms. Qualls, "it had a whole different emotional level

to it than I was able to escape from it."  (Id. at 2665.)  She stated that she was then more willing

to convict petitioner of second degree murder, whereas before she saw Ms. Qualls she had been

"firmly for voluntary manslaughter."  (Id. at 2666, 2671.)  She further stated that after she

recognized Ms. Qualls in the courtroom, it affected her decision "for a more serious crime than a

less serious crime."  (Id. at 2671.)  She explained that she wanted to discuss with the jury the

option of convicting petitioner of involuntary manslaughter, but that option was not legally

available and she "was ridiculed by saying it" and was "mocked and mimicked by the Greek

choir at the end of the table."  (Id. at 2688.)

Juror #4 also testified that she didn't remember how she knew Sheila Qualls when

she saw her in the courtroom, but her name "came to [her]" later.  (Id. at 2661.)  She told Juror

#2 and an alternate juror that maybe she should "step down" as a juror.  (Id. at 2661-62.)  She

also testified that she "got fairly close with [Ms. Qualls]," and that they "visited quite a bit at the

Bee and outside."  (Id. at 2663.)

Juror #4 testified she discussed with Juror #2 that they "didn't feel there was any

evidence against Kenneth McClish anyway so far."  (Id.)  This issue was also discussed during

deliberations, as was the credibility of some of the witnesses.  (Id. at 2658-59, 2669-70.)  She

further testified that she discussed the testimony of witnesses and the facts of the case with

several other jurors before deliberations began.  (Id. at 2673-76, 2679-82.)  She stated that

1   Rodney McClish, brother and witness for Ken McClish, approached her, Juror #2, and Juror #10

2   outside the courthouse and informed them that his testimony about the gun was "the truth."  (Id.

3   at 2659-60, 2670.)  Juror #4 did not tell the other jurors during deliberations about Rodney

4   McClish's comments to her and the other two jurors.  (Id. at 2677.)  She also testified she was

5   told by other jurors that she would be "reported" to the trial judge if she didn't cooperate.  (Id. at

6   2693-95.)

7              The alternate juror testified that she and Juror #4, along with other jurors,

8   discussed the facts of the case prior to and outside of jury deliberations.  (Id. at 2697, 2700-07.)

9   Specifically, they talked about the credibility of the witnesses and why Michael Washington

10  hadn't testified.  (Id. at 2698.)  Juror #4 told the alternate that she thought she recognized a lady

11  she saw in the courtroom and on the elevator, but that she couldn't remember her name or why

12  she knew her.  (Id. at 2699.)  The next day, Juror #4 stated that she had remembered she used to

13  work with the lady, that her name was Sheila Qualls, and "she didn't know what she was

14  supposed to do about that."  (Id.)  Juror #4 told the alternate that she couldn't be fair because of

15  this.  (Id. at 2700.)  The alternate juror explained:

16              It did change things for her because it put a personal face on the
             family for her because this was someone that she knew and she
17              liked, and that she – she was – she didn't know what to do.  She
             was very conflicted about what to do about that and that's when I
18              told her – and I did tell her that if she was concerned about how
             procedurally with the Court, that she needed to talk to him about it
19              because he could help her with her – with the conflict that she had.

20              Q.  And then she basically said she couldn't be fair because of that,
             because of knowing Sheila?
21
             A.  I would say she didn't say that she couldn't be fair, but she was
22              very concerned that her whole – it changed how she felt about the
             trial.  I can say that.  I can't say that she came out and said she
23              couldn't be fair.  I think she worried about – she just worried about
             it.  She was concerned about it.  She didn't want to go into
24              deliberations knowing this person changed everything about the
             trial for her.

25  /////

26  /////

18

(Id. at 2709-10.)[13]

Juror #7 testified that Juror #4 did not tell other jurors during deliberations that Rodney McClish had approached her about his trial testimony.  (Resp't's Lod. Doc. 19 at 2716.) He denied threatening to "turn in" Juror #4 and stated that Juror #4 deliberated and expressed her views during deliberations.  (Id. at 2717-18.)  He stated that one juror suggested to Juror # 4 that she was failing to deliberate in good faith, but no juror threatened to turn her in for failing to deliberate.  (Id. at 2718.)  He also stated that none of the jurors discussed the case with each other outside of the deliberation process.  (Id.)

Juror # 5 testified that he did not discuss the case outside of the deliberation process and did not hear anyone else do so.  (Id. at 2729.)  He stated that Juror #4 was allowed to "speak her peace [sic] and participate in the deliberations."  (Id.)  He was not informed, and did not know, that Juror #4 had recognized someone in the courtroom who was related to one of the victims.  (Id. at 2730.)

Juror #8 also testified that he did not discuss the case outside of the deliberation process and did not hear any other juror do so.  (Id. at 2733.)  He testified that Juror #4 was able to and did fully participate in the deliberation process.  (Id.)  He was not informed, and did not know, that Juror #4 had recognized someone in the courtroom who was related to one of the victims.  (Id. at 2734.)  He never threatened to report Juror #4 to the judge for being uncooperative during the deliberation process.  (Id.)  He did not hear Rodney McClish inform any juror that he had told the truth during his testimony.  (Id. at 2735.)

---

[13]  The alternate juror submitted a "supplemental declaration" to the trial court, apparently while the hearing on the motion for new trial was ongoing.  (June 5, 2009 "Reply to Answer" (hereinafter Traverse), App. A.)  The declaration states that the wife and brother of Juror #7 sat in the courtroom during the testimony of Juror #4 and then reported to the rest of the jurors what Juror #4 had said.  (Id.)  The declaration also: (1) describes the reaction of the other jurors to the reported testimony of Juror #4; (2) states that one juror reminded the other jurors that they should have learned from the trial "to answer questions posed to them as 'yes' or 'no,' and when in trouble, to use the words 'I don't recall;'" and (3) states that the family of the victim became agitated and stared at the jurors as the hearing went on.  (Id.)

Juror #12 agreed that neither he nor any other juror discussed the case outside of the deliberation process.  (Id. at 2741, 2745-46.)  He testified that Juror #4 was allowed to deliberate with the other jurors and that she did not inform him that she might have been acquainted with a person in the audience who may have been related to one of the victims.  (Id. at 2742.)  Juror #4 did not tell him that one of the witnesses in the case had approached her and made a comment regarding his testimony at trial.  (Id.)  He never threatened to report Juror #4 for being uncooperative during the deliberation process, nor did he hear any other juror threaten to do this.  (Id. at 2742-43.)

Prior to her testimony, Juror #2 submitted an affidavit to the trial court in which she stated that Juror #4 told her she knew someone in the audience who was related to the victim.  (Id. at 2747.)  She testified that Juror #4 told her this "once, maybe twice."  (Id.)  She stated that Juror #4 did not express any particular concern about this, nor did she tell Juror #2 why she was telling her about it.  (Id. at 2751.)  This knowledge did not influence Juror #2 "in terms of any decision [she] might have made in the case."  (Id. at 2748.)  Juror #2 stated that she did not discuss the case with the other jurors outside of the deliberation process.  (Id.)  She agreed that "witness comments were made" between the jurors but she did not remember any specifics of those comments.  (Id. at 2749.)  She testified that Juror #4 was able to fully participate in deliberations.  (Id.)  Nothing that she discussed with Juror #4 affected her vote or her position on the case.  (Id.)  Juror #2 testified that Rodney McClish did not approach her in the hallway after his testimony and make any comments, nor did she overhear Mr. McClish make such a comment to any other juror.  (Id. at 2750.)

Juror #6 testified that neither he nor any other juror discussed the case outside of the deliberation process.  (Id. at 2756.)  He testified that Juror #4 expressed her views during deliberations.  (Id.)  He further testified that Juror #4 did not tell him she knew a relative of one of the victims in the case.  (Id. at 2757.)  He was not aware that one of the witnesses in the case had told Juror #4 that his testimony was truthful.  (Id.)

1    Juror #9 testified that neither he nor any other juror discussed the case outside of

2 the deliberation process.  (Id. at 2759-60.)  He stated that Juror #4 was able to fully participate in

3 the deliberation process.  (Id. at 2760.)  Juror #4 did not tell him that she recognized anyone in

4 the audience.  (Id.)

5    Juror #11 testified that he discussed "the rounds of the bullet" with other jurors in

6 the hallway.  (Id. at 2763.)  This did not affect him in any way in terms of the fairness of the

7 deliberation process.  (Id. at 2765.)  Other than that conversation, neither he nor any other juror

8 discussed the facts of the case.  (Id. at 2768.)  He testified that Juror #4 was able to participate in

9 the deliberation process.  (Id.)  Juror #4 did not indicate to him that she was acquainted with

10 someone in the audience who was related to one of the victims, or that one of the witnesses told

11 Juror #4 that his testimony was truthful.  (Id. at 2766.)

12    Juror #1 testified that she followed the trial court's admonition not to discuss the

13 case outside of the deliberation process and that, as far as she knew, the other jurors did the same.

14 (Id. at 2771-72.)  She testified that Juror #4 was able to fully participate in the deliberation

15 process and was not threatened to change her opinions.  (Id. at 2772.)  Juror #4 did not tell her

16 that she recognized any person in the audience or that one of the witnesses told Juror #4 that his

17 trial testimony had been truthful.  (Id. at 2773.)  Juror #1 testified that Juror #4 attempted to bring

18 up the subject of sentencing during deliberations, but she was reminded by the other jurors that

19 this was not a proper subject to consider.  (Id. at 2774, 2776.)

20    The trial court also heard the testimony of Sheila Qualls, the sister of victim Allen

21 Qualls.  (Id. at 2791.)  Ms. Qualls testified that she recognized Juror #4 when she saw her in

22 court.  (Id.)  Both she and Juror #4 had worked at the Sacramento Bee, but she did not

23 "personally know" Juror #4.  (Id. at 2792.)  She stated that Juror #4 was not a union

24 representative at the Bee, as she had told the court, and that Juror #4 did not help her with a

25 salary issue.  (Id. at 2792.)  Ms. Qualls also testified that she did not make eye contact with

26 anyone in the elevator and that she did not look around at anyone in the elevator.  (Id. at 2793.)

Ms. Qualls  testified that she had "no relationship at all" with Juror #4.  (Id. at 2794.)

The trial judge denied the motion for new trial with respect to all of the arguments made by petitioner that the court had not previously ruled on.  The trial judge explained his ruling as follows:

> The Court has considered the pleadings of the parties, the testimony of the witnesses and the arguments of the parties.  This matter comes down to a credibility question of whether the Court believes the testimony given by Juror Number Four and the alternate juror or whether the Court believes the testimony of the remaining jurors.
>
> The Court specifically finds that the testimony of Juror Number Four was not credible nor was the testimony of the alternate juror.  Their testimony was not corroborated except in part by each other.  The two did admit to conversing with each other on these matters before giving their testimony at the New Trial Motion hearing which allowed them the opportunity to fabricate their stories.
>
> No other juror testified in conformity with Juror Number Four or the alternate juror.  There is no reason for the Court to find that all the other jurors have fabricated any matter.  On the other hand, it appears to the Court that Juror Number Four has had buyer's remorse over her verdict and has been attempting to withdraw her votes on the verdicts in any way that she can think of.
>
> The Court therefore disbelieves the testimony of Juror Number Four and the alternate juror.  Nor does the Court believe any further allegations made by Juror Four and the alternate juror in their subsequent affidavits from them recently filed with the Court.
>
> The Court specifically finds as a fact that no misconduct had occurred as alleged by Juror Four and the alternate juror nor will the verdict be overturned for any alleged pain felt by Juror Four during deliberations which the Court does not believe occurred.  Therefore, the Motion For a New Trial is denied.

(Id. at 2806-07.)

## 2. Applicable Law

Under the Sixth Amendment, a criminal defendant has the right to be tried by an impartial jury and to confront and cross-examine the witnesses who testify against him.  See Irvin v. Dowd, 366 U.S. 717, 722 (1961); Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987).  Jurors are objectionable if they have formed such deep and strong impressions that they will not

22

listen to testimony with an open mind.  Irvin, 816 U.S. at 722 n.3.  A defendant is denied the

right to an impartial jury if even one juror is biased or prejudiced.  Dyer v. Calderon, 151 F.3d

970, 973 (9th Cir. 1998) (en banc); United States v. Eubanks, 591 F.2d 513, 517 (9th Cir. 1979).

Thus, "[t]he presence of a biased juror cannot be harmless; the error requires a new trial without

a showing of actual prejudice." United States v. Gonzalez, 214 F.3d 1109, 1111 (9th Cir. 2000)

(quoting Dyer, 151 F.3d at 973 n.2).

        A defendant in a criminal case is also entitled to a jury that reaches a verdict on

the basis of evidence produced at trial.  Turner v. Louisiana, 379 U.S. 466 (1965); Estrada v.

Scribner, 512 F.3d 1227, 1238 (9th Cir. 2008); Bayramoglu v. Estelle, 806 F.2d 880, 887 (9th

Cir. 1986) ("Jurors have a duty to consider only the evidence which is presented to them in open

court.").  The introduction of prejudicial extraneous influences into the jury room constitutes

misconduct which may result in the reversal of a conviction.  Parker v. Gladden, 385 U.S. 363,

364-65 (1966).  However, it is not improper for a juror to bring his or her outside experiences to

bear during deliberations.  See Grotemeyer v. Hickman, 393 F.3d 871, 878 (9th Cir. 2004) (not

improper for jury foreperson, a physician, to express her opinion that the defendant's mental

illness caused him to commit the crime and that he would receive adequate mental health care in

prison); United States v. Navarro-Garcia, 926 F.2d 818, 821-822 (9th Cir. 1991) (not improper

for a juror to rely on his/her past personal experiences when hearing a trial and deliberating on a

verdict as long as personal experiences are relevant only for purposes of interpreting the record

evidence).  On collateral review, trial errors, such as extraneous information that was considered

by the jury, "are generally subject to a 'harmless error' analysis, namely, whether the error had

'substantial and injurious' effect or influence in determining the jury's verdict." Jeffries v.

Wood, 114 F.3d 1484, 1491 (9th Cir. 1997)), overruled on other grounds by Lindh v. Murphy,

521 U.S. 320 (1997) (citing Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).  See also Estrada,

512 F.3d at 1235; Brown v. Ornoski, 503 F.3d 1006, 1018 (9th Cir. 2007) (finding not to be

objectively unreasonable the state court's rejection of a claim based upon the allegation that four

1    jurors had overheard petitioner's family and friends conversing about the case); <u>Fields v. Brown</u>,

2    431 F.3d 1186, 1209 n.16 (9th Cir. 2005) (noting that <u>Brecht</u> provides the standard of review for

3    harmless error in cases involving unconstitutional juror misconduct).

4            "Any unauthorized communication between a juror and a witness or interested

5    party is presumptively prejudicial, but the government may overcome the presumption by making

6    a strong contrary showing." <u>Caliendo v. Warden of California men's Colony</u>, 365 F.3d 691, 694

7    (9th Cir.), <u>cert. denied</u> 543 U.S. 927 (2004).  <u>See also</u> <u>Remmer v. United States</u>, 347 U.S. 227,

8    228 (1954).  "[I]f an unauthorized communication with a juror is *de minimus*, the defendant must

9    show that the communication could have influenced the verdict before the burden of proof shifts

10   to the prosecution . . . [and] must offer sufficient evidence to trigger the presumption of

11   prejudice." <u>Caliendo</u>, 365 F.3d at 696 (internal quotations omitted).  Factors relevant to this

12   inquiry include "the length and nature of the contact, the identity and role at trial of the parties

13   involved, evidence of actual impact on the juror, and the possibility of eliminating prejudice

14   through a limiting instruction." <u>Id.</u> at 365 F.3d at 697-98.  Cases providing examples of contact

15   found to be de minimus include: <u>Lee v. Marshall</u>, 42 F.3d 1296 (9th Cir. 1994) (two police

16   officers, one of them the investigating officer in the case, entered the jury room during

17   deliberations without the court's permission to set up a VCR to replay a witness's testimony);

18   <u>Helmick v. Cupp</u>, 437 F.2d 321 (9th Cir. 1971) (three arresting sheriff's deputies, one of them a

19   prosecution witness, drove the jurors to the scene of the crime after being designated by the trial

20   court as bailiffs for that purpose); and <u>United States v. Day</u>, 830 F.2d 1099, 1103-04 (10th Cir.

21   1987) (a juror and a federal agent who sat at the prosecutor's table exchanged a "casual,

22   time-of-the-day greeting" in the men's room).  If such a juror communication is not de minimus,

23   prejudice is presumed and the defendant is entitled to a new trial "unless the prosecution shows

24   that there is no reasonable possibility that the communication will influence the verdict."

25   <u>Caliendo</u>, 365 F.3d at 696.

26   /////

1          3. Analysis

2               a. Juror No. 7

3                    i. Concealing Information on Voir Dire

4          Petitioner claims that Juror #7 deliberately concealed during voir dire that he had

5 been the victim of child molestation.  Petitioner argues that the trial court's ruling that Juror #7's

6 concealment was unintentional and non-prejudicial is erroneous and not supported by the record.

7 He contends that the ruling cannot be based on the affidavit of Juror #7, or on his testimony at

8 the hearing on the motion for new trial, because the subject was not discussed in the affidavit and

9 did not come up during the hearing.  (Am. Pet. at 6(g); Traverse at 10-12.)  Petitioner contends

10 that Juror #7 "lied."  (Traverse at 11-12.)  This court construes petitioner's arguments as a claim

11 that Juror #7 harbored implied bias, as reflected in his failure to disclose the molestation during

12 voir dire.

13          Courts have analyzed juror bias under two theories, actual bias and implied (or

14 presumed) bias.  Fields, 503 F.3d at 767-68.  Actual bias is "'bias in fact' – the existence of a

15 state of mind that leads to an inference that the person will not act with entire impartiality."

16 Gonzalez, 214 F.3d at 1112 (quoting United States v. Torres, 128 F.3d 38, 43 (2d Cir. 1997)).

17 Although actual bias is the more common grounds for excusing jurors for cause, "[i]n

18 extraordinary cases, courts may presume bias based upon the circumstances."  Gonzalez, 214

19 F.3d at 1112 (quoting Dyer, 151 F.3d at 981).  See also McDonough Power Equipment, Inc. v.

20 Greenwood, 464 U.S. 548, 556-57, 558 (1984); Smith v. Phillips, 455 U.S. 209, 221-24 (1982)

21 (O'Connor, J, concurring) ("there are some extreme circumstances that would justify a finding of

22 implied bias"); Clark v. United States, 289 U.S. 1, 11 (1933).  Implied bias is bias conclusively

23 presumed as a matter of law.  United States v. Wood, 299 U.S. 123, 133 (1936); United States v.

24 Greer, 285 F.3d 158, 171 (2d Cir. 2000) (citing Torres, 128 F.3d at 45).  On collateral review, a

25 petitioner must show that the alleged error " 'had substantial and injurious effect or influence in

26 determining the jury's verdict.'"  Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th Cir. 1993) (quoting

1   Brecht, 507 U.S. at 637).

2          In McDonough a juror failed to inform the trial court, in response to a voir dire

3   question seeking to elicit information about previous injuries to members of the juror's

4   immediate family that resulted in disability or prolonged pain, that his son had sustained such an

5   injury.  464 U.S. at 550.  The juror explained that he did not believe his son's injury (a broken

6   leg) was relevant to the trial court's inquiry because it did not result in disability or prolonged

7   pain.  Id. at 552 n.3.  In declining to order a new trial on the basis of juror bias under these

8   circumstances, the United States Supreme Court explained:

9               To invalidate the result of a three-week trial because of a juror's
                mistaken, though honest response to a question, is to insist on
10              something closer to perfection than our judicial system can be
                expected to give.  A trial represents an important investment of
11              private and social resources, and it ill serves the important end of
                finality to wipe the slate clean simply to recreate the peremptory
12              challenge process because counsel lacked an item of information
                which objectively he should have obtained from a juror on voir
13              dire examination.

14   Id. at 555.  The Supreme Court held in that case that "to obtain a new trial in such a situation, a

15   party must first demonstrate that a juror failed to answer honestly a material question on voir

16   dire, and then further show that a correct response would have provided a valid basis for a

17   challenge for cause."  Id. at 556.

18          In Fields, a juror in a rape trial disclosed on voir dire that his wife had been

19   assaulted and beaten, but failed to specify that she had also been raped.  When questioned after

20   the verdict at an evidentiary hearing before the federal district court about this voir dire answer,

21   the juror explained that when he volunteered that his wife had been assaulted and beaten, he

22   expected for people in the courtroom to understand that she had been sexually abused.  503 F.3d

23   at 765.  The juror testified that, if asked, he would have said that he could be fair and impartial.

24   Id.  He explained that he told the truth when he stated he would base his decision strictly on the

25   evidence presented, and stated that he did his best to be a fair juror.  Id.  The district court found

26   that the juror was not dishonest during voir dire, that he was not actually biased, and that

1  application of the implied bias doctrine in the absence of juror dishonesty would be a new rule

2  barred by Teague v. Lane, 489 U.S. 288 (1989).  Fields, 503 F.3d at 763.  The Ninth Circuit

3  agreed, concluding, first, that the juror did not respond dishonestly on voir dire and did not intend

4  to mislead the trial court when he used the word "assault" instead of "rape" and "kidnap" to

5  describe what had happened to his wife.  Id. at 767.  To the extent the juror may have been

6  mistaken in assuming that the words he used would make it apparent that his wife had also been

7  raped, the Ninth Circuit concluded that this was "an honest mistake for a layperson to make."  Id.

8  The court also concluded that there was no evidence the juror harbored "actual bias" and that the

9  facts indicated the juror had remained impartial, notwithstanding what had happened to his wife.

10  Id. at 767-68.  Finally, the Ninth Circuit found that the juror in question did not harbor implied

11  bias.  The court noted that the Supreme Court has never held that a juror was impliedly biased in

12  the absence of juror dishonesty, while the Ninth Circuit has recognized that "it is an unresolved

13  question whether dishonesty is a necessary predicate to a finding of juror bias."  Id. at 771.

14         On the other end of the spectrum, bias was presumed in Dyer where a juror

15  answered "no" when asked during voir dire whether she or any of her relatives or close friends

16  had ever been the victim of any type of crime when, in fact, her seventeen year old brother had

17  been murdered execution-style; and then told the judge she had answered "no" because she

18  thought the shooting was an accident.  151 F.3d at 983.  Similarly, the Ninth Circuit presumed

19  bias in a case where the jury foreperson in a murder trial lied about his own prior felony

20  conviction on a written jury questionnaire and in voir dire, and where his "pattern of lies,

21  inappropriate behavior, and attempts to cover up his behavior introduced 'destructive

22  uncertainties' into the fact-finding process."  Green v. White, 232 F.3d 671, 676  (9th Cir. 2000)

23  (quoting Dyer, 151 F.3d at 983).

24         This present case is clearly more akin to McDonough and Fields than to Dyer and

25  Green.  Juror #7 explained to the prosecutor that, because of the unexpected presence of the

26  defendants and defense counsel in the room,  he became flustered when questioned by the trial

1  judge about his voir dire answer and forgot what he wanted to discuss in private.  Although he

2  later remembered, he decided not to mention it because he thought it was not material to the

3  issues posed in the case.  There is no evidence before this court that Juror #7 was partial or

4  biased, or that he intended to mislead the trial court by his voir dire responses.  Further, Juror #7

5  assured the trial judge that the molestation incident did not affect his judgment in this case.  The

6  Ninth Circuit has stated that a reviewing court must "be tolerant, as jurors may forget incidents

7  long buried in their minds . . . or bend the truth a bit to avoid embarrassment."  Dyer, 151 F.3d at

8  973.  The Supreme Court has held that an honest yet mistaken answer to a voir dire question

9  rarely amounts to a constitutional violation and that even an intentionally dishonest answer is not

10  fatal, so long as the falsehood does not bespeak a lack of impartiality.  McDonough, 464 U.S. at

11  555-56.  See also id. at 554 ("the motives for concealing information may vary, but only those

12  reasons that affect a juror's impartiality can truly be said to affect the fairness of the trial").

13         Here, as noted by the trial judge, Juror #7 was only thirteen when the molestation

14  occurred, and the sexual abuse was completely dissimilar to the crimes with which petitioner and

15  his co-defendants were charged.  The conclusion of the trial judge that these circumstances

16  reflected only an unintentional failure to disclose a non-material fact is reasonable.  This court

17  also rejects petitioner's argument that the trial court's ruling had no support in the record.  The

18  fact that Juror #7 did not testify about this matter, or that his affidavit did not mention it, is not

19  dispositive.  The trial judge's ruling was supported by Juror #7's statements to the prosecutor,

20  which were memorialized in the prosecutor's letter to defense counsel.

21         In the absence of any evidence of juror dishonesty, this court cannot conclude that

22  petitioner has demonstrated actual or implied bias.  There is no evidence that Juror #7 was

23  "biased in fact."  Moreover, this is not the type of "extreme circumstance" that would give rise to

24  a finding of implied bias.  Accordingly, petitioner is not entitled to federal habeas relief with

25  respect tp this aspect of his juror misconduct claim.

26  /////

ii. <u>Extraneous Information</u>

Petitioner claims that Juror #7 committed misconduct when he brought extraneous information about his personal experience at another Taco Bell restaurant into jury deliberations. (Am. Pet. at 6(a).)  Petitioner also appears to adopt the allegation contained in the declaration of Juror #4, described above, to the effect that Jurors #5, #7 and #8 performed "improper experiments during the jury view of the crime scene and discussed them during deliberations." (<u>Id.</u> at 6(c).)  Petitioner complains that none of these three jurors was asked during the hearing on the motion for new trial about the conducting of experiments during deliberations.  (<u>Id.</u> at 6(f).)

As discussed above, the trial court concluded that Juror #7's remarks about his experiences at a different Taco Bell were not improper or prejudicial because they merely concerned a "life experience" and because no extraneous information was brought into the deliberations.  (RT at 2652.)  Specifically, the judge stated that "a view of the scene by the jury is independent evidence that they may consider," it was "a view of the scene that was within the range of the evidence," and there was no evidence of any experimentation in the jury room. (<u>Id.</u> at 2653.)

"Juror misconduct typically occurs when a member of the jury has introduced into its deliberations matter which was not in evidence or in the instructions."  <u>Thompson v. Borg</u>, 74 F.3d 1571, 1574 (9th Cir. 1996) (quoting <u>Marino v. Vasquez</u>, 812 F.2d 499, 504 (9th Cir. 1987)). A jury is permitted to examine evidence which was admitted at trial.  <u>United States v. Rincon</u>, 28 F.3d 921, 926-27 (9th Cir. 1994).  Although jurors may "bring their life experiences to a case," they may not "decide a case based on personal knowledge of facts specific to the litigation." <u>Mancuso v. Olivarez</u>, 292 F.3d 939, 950 (9th Cir. 2002).

Assuming arguendo that Juror #7 committed misconduct when he mentioned to the other jurors that he had seen two teenagers running up to the drive-through area at another Taco Bell and enter the car immediately behind him, petitioner has failed to demonstrate any prejudice flowing therefrom.  There is no evidence in the record before this court that any such

comment by Juror #7 had any negative impact on the jury deliberations or that any juror was

incapable of rendering an unbiased verdict as a result of Juror #7's observation.  Accordingly,

petitioner is not entitled to relief on this aspect of his claim of juror misconduct.

Petitioner has also failed to demonstrate that any juror committed misconduct in

bringing extraneous information into the deliberations.  The record before this court reflects only

that the jurors observed the crime scene from the location where Ralph King was allegedly

standing at the time of the shooting.  This case does not involve a claim that jurors conducted an

experiment on an item not received in evidence, nor does it involve independent research

allegedly undertaken by a jury.  Petitioner has cited no case, and this court has found none, in

which any court has suggested that the viewing of a crime scene, with the permission of the trial

court, constitutes misconduct or amounts to a violation of petitioner's right of confrontation, his

right to an impartial jury, or any other constitutional right.  Finally, the trial court instructed the

jurors that they had an obligation to decide all questions of fact from the evidence received at

trial and not from any other source.  (Clerk's Transcript on Appeal (CT) at 1582.)  The jury is

presumed to have followed this instruction.  Penry, 532 U.S. at 799; Richardson v. Marsh, 481

U.S. 200, 211, (1987); McKenzie v. Risley, 842 F.2d 1525, 1533 (9th Cir. 1988).

For all of these reasons, petitioner is not entitled to relief on his claim that his

constitutional rights were violated by improper experimentation by the jurors.

    b.  Juror No. 4

     i.  Relationship with Sheila Qualls

Petitioner claims that Juror #4 committed misconduct when she failed to tell the

trial judge that she recognized a family member of Allen Qualls in the courtroom.  Petitioner's

claim in this regard, in essence, is that Juror #4 was unable to render an unbiased verdict after

seeing Ms. Qualls.  Petitioner argues the trial court's ruling that Juror #4 was not biased is

incorrect because there is no dispute that Juror #4 knew and recognized Sheila Qualls.  (Am. Pet.

at 6(h).)  Petitioner also argues the trial court's conclusion that Juror #4 lacked credibility is

1  based on "a misstated record" because her testimony that she recognized Sheila Qualls was

2  corroborated by the testimony of the alternate juror and Juror #2.  (Traverse at 12-13.)

3          As noted above, the trial judge questioned Juror #4 at length about her assertion

4  that she could not be a fair juror after seeing Sheila Qualls in the courtroom.  He also questioned

5  numerous other jurors and Sheila Qualls herself on this subject.  The judge ultimately concluded

6  that Juror #4 was exaggerating in order to invalidate a verdict which she had subsequently come

7  to regret.  The judge also concluded that the testimony of Juror #4 and the alternate juror

8  appeared to have been fabricated in an attempt to convince the judge to overturn the verdict.

9          A trial judge's conclusion, after a hearing, that a juror does or does not harbor

10  "actual bias" is a finding of fact to which the presumption of correctness applies.  Dyer, 151 F.3d

11  at 973.  See also 28 U.S.C. § 2254(d); Wainwright v. Witt, 469 U.S. 412, 424 (1985); Smith v.

12  Phillips, 455 U.S. 209, 218 (1982); Hamilton v. Ayers, 583 F.3d 1100, 1107 (9th Cir. 2009).

13  This is because such a decision "depends heavily on the trial court's superior ability to appraise

14  witness credibility and demeanor."  Thompson v. Keohane, 516 U.S. 99, 99-100 (1995).  See

15  also Witt, 469 U.S. at 428 ("[T]he question whether a venireman is biased has traditionally been

16  determined through voir dire culminating in a finding by the trial judge concerning the

17  venireman's state of mind . . . such a finding is based upon determinations of demeanor and

18  credibility that are peculiarly within a trial judge's province.").

19          Petitioner has not overcome the presumption of correctness that attaches to the

20  trial court's finding that Sheila Qualls did not harbor actual bias.  The trial judge's conclusions

21  were based on his appraisal of the credibility of the jurors who testified, and the opportunity for

22  collusion between Jurors #4 and the alternate juror.  As set forth above, these determinations

23  were "peculiarly within the trial judge's province."  Wainwright, 469 U.S. at 428.  See also

24  Thompson, 516 U.S. at 111.  The court finds that petitioner's argument that all parties agreed

25  Juror #4 recognized Sheila Qualls, is a red herring.  The question is not whether Juror #4 and

26  Sheila Qualls recognized each other, but whether the nature of the relationship was such as to

1   create actual or implied bias on the part of Juror #4 .  The trial court's conclusion, following an

2   evidentiary hearing, that Juror #4 was not actually biased should not be set aside.

3              The Ninth Circuit has, in several cases, presumed bias from "the 'potential for

4   substantial emotional involvement, adversely affecting impartiality,' inherent in certain

5   relationships." Tinsley v. Borg, 895 F.2d 520, 527 (9th Cir. 1990) (quoting United States v.

6   Allsup, 566 F.2d 68, 71 (9th Cir. 1977)).  As the Ninth Circuit has explained:

7              Unlike the inquiry for actual bias, in which we examine the juror's
              answers on voir dire for evidence that she was in fact partial, the
8              issue for implied bias is whether an average person in the position
              of the juror in controversy would be prejudiced.  Accordingly, we
9              have held that prejudice is to be presumed where the relationship
              between the prospective juror and some aspect of the litigation is
10             such that it is highly unlikely that the average person could remain
              impartial in his deliberations under the circumstances.

11

12  Gonzalez, 214 F.3d at 1112 (citations and internal quotes omitted) (emphasis in original).  See

13  also United States v. Mitchell, 568 F.3d 1147, 1151 (9th Cir. 2009).   Implied bias may be found

14  despite a juror's denial of any partiality.  See United States v. Torres, 128 F.3d 38, 45 (2d Cir.

15  1997) ("And in determining whether a prospective juror is impliedly biased, 'his statements upon

16  voir dire [about his ability to be impartial] are totally irrelevant.'"); Gonzales v. Thomas, 99 F.3d

17  978, 987 (10th Cir. 1996); United States v. Nell, 526 F.2d 1223, 1229 n.8 (5th Cir. 1976) (The

18  concept of implied or presumed bias arises from "situations in which the circumstances point so

19  sharply to bias in a particular juror that even his own denials must be discounted.").

20             In assessing claims of implied bias "prudence dictates that courts answering this

21  question should hesitate before formulating categories of relationships which bar jurors from

22  serving in certain types of trials." Tinsley, 895 F.2d at 527.  This is because imposition of the

23  doctrine of implied bias allows reviewing courts to "circumvent the presumption of deference

24  due trial court factual findings on the existence of actual bias." Id. at 528.  Thus, it has been

25  repeatedly held that government employees, barring actual bias, are not automatically

26  disqualified from serving on a jury in a case where the government is a party.  See Dennis v.

32

United States, 339 U.S. 162 (1950); Frazier v. United States, 335 U.S. 497 (1948); United States v. Wood, 299 U.S. 123 (1936).  Courts will not presume bias simply because a juror works in law enforcement, is related to someone working in law enforcement or is acquainted with law enforcement personnel.   See United States v. Le Pera, 443 F.2d 810, 812 (9th Cir. 1971) ( no bias where a juror was the wife of a police officer because "bias and prejudice will not be presumed from the fact that a juror is engaged in law enforcement work"); see also United States v. Caldwell, 543 F.2d 1333, 1347 (D.C. Cir. 1974) (absent a showing of actual bias, a defendant not entitled to new trial where juror was a policeman's relative); Mikus v. United States, 433 F.2d 719, 723-24 (2d Cir. 1970) (no bias where juror in a criminal trial was a former police officer).

On the other hand, bias is to be presumed where the nature of a juror's employment creates a legitimate fear of the type of criminal activity committed by the defendant. Allsup, 566 F.2d at 71-72 (presumed bias where two prospective jurors in a bank robbery trial were employees at a different branch of the same bank that was robbed due to their "reasonable apprehension of violence" and because the nature of their employment created a "substantial probability" that they could not be impartial); see also Hunley v. Godinez, 975 F.2d 316, 318-21 (7th Cir. 1992) (sequestered jurors in a burglary/murder trial burglarized during deliberations). Where a juror is an actual employee of the office prosecuting the action, bias will also be presumed.  See Smith v. Phillips, 455 U.S. at 222; United States v. Polichemi, 219 F.3d 698, 703-04 (7th Cir. 2000).   Several courts have likewise recognized that implied bias exists where a juror is an actual employee of the prosecuting agency.  Tinsley, 895 F.2d at 523; see also Gonzalez v. Thomas, 99 F.3d 978, 987 (10th Cir. 1996); Andrews v. Collins, 21 F.3d 612, 620 (5th Cir. 1994); United States v. Calabrese, 942 F.2d 218, 226 (3d Cir. 1991).[14]

---

[14]  In her concurring opinion in Smith v. Phillips, Justice O'Conner suggested that bias may be presumed where a juror is "a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction."  455 U.S. at 222 (O'Connor, J., concurring).

1          In this case, the trial judge believed Sheila Qualls' description of her relationship

2    with Juror #4, and disbelieved the description of that relationship provided by Juror #4.  Because

3    Sheila Qualls characterized the relationship as "no relationship at all," there is no potential for

4    "substantial emotional involvement, adversely affecting impartiality" inherent in the relationship.

5    Tinsley, 895 F.2d at 527.  Even if the relationship between the two was as described by Juror #4,

6    this court cannot conclude that an average person in the position of Juror #4 would have been

7    unable to render an unbiased verdict after seeing Sheila Qualls in the courtroom.  Juror #4 was

8    not related to, nor did she have a "close personal relationship" with any party in the action or

9    with any witness; she had never been employed by the prosecutor's office, and she did not have

10   anything to do with the events underlying the charges against petitioner.  Further, Juror #4

11   testified that she considered whether to tell the trial judge about the situation at the time but

12   decided not to do so, presumably because she concluded that it was not material or significant.

13   Under the circumstances presented here, there is no basis for a claim of juror misconduct or juror

14   bias.  Accordingly, petitioner is not entitled to federal habeas relief on the basis of this claim.

15              ii.  Improper Contact by Trial Witness

16          Petitioner also claims that Juror #4 committed misconduct by failing to tell the

17   trial court prior to deliberations that she and Jurors #2 and #10 had been approached by Rodney

18   McClish outside of the courtroom and informed by him that his trial testimony was true.

19   Petitioner argues that Juror #4's description of this event was not contradicted by any other juror

20   during the hearing on his motion for new trial.  Petitioner notes that when Juror #2 was

21   questioned, she was asked whether she was approached by witness Rodney McClish, "in the

22   hallway."  (Am. Pet. at 6(d); RT at 2750.)  She answered "no."  (RT at 2749-50.)  However,

23   Juror #4 testified that she and Jurors No. 2 and 10 were actually approached by Rodney McClish

24   on the doorsteps of the courthouse and not in the hallway.  (Am. Pet. at 6(d) - 6(e); RT at 2659-

25   60, 2670.)  Petitioner implies that Juror #2 denied that this incident took place based solely on

26   the fact that she was not approached in the hallway but on the steps outside the courthouse.

1   Petitioner also notes that Juror #10, the only other witness to the alleged conversation with

2   Rodney McClish, did not testify at the hearing on his motion for new trial. (Am. Pet. at 6(e).)

3   Petitioner argues that the trial court's rejection of this claim was based on "less than a full and

4   fair hearing" because Juror #10 did not testify and Juror #2 was questioned in a way that

5   prompted an incorrect answer. (Traverse at 12, 14-15.) Petitioner also notes the trial judge

6   stated that because Jurors #4 and #2 discussed their proposed testimony prior to the hearing, they

7   had an opportunity to fabricate their testimony. Petitioner complains that the trial judge chose to

8   believe the testimony of the other jurors even though the supplemental affidavit of the alternate

9   juror implied that those other jurors may have fabricated their testimony as well. (Id. at 15-16.)

10         The trial judge concluded that Juror #4 had fabricated this incident involving

11   witness Rodney McClish. As explained above, the trial judge's conclusion was based on his

12   observations of the testifying jurors and is entitled to a presumption of correctness. Assuming

13   arguendo that Jurors #4, #2, and #10 were approached by Rodney McClish and informed that his

14   trial testimony was true, and further assuming that this contact was more than de minimus,

15   thereby triggering a presumption of prejudice, this court concludes that there is no reasonable

16   possibility the contact influenced the jury's verdict. Caliendo, 365 F.3d at 697. McClish's

17   statement did not involve any new evidence or information. At most, it simply emphasized his

18   oath to tell the truth on the witness stand. Further, as summarized by the California Court of

19   Appeal, the gist of Rodney McClish's testimony was that "contrary to Betty Patterson's account,

20   he did not remove a gun from under [Kenneth] McClish's bed on August 25, 2003, and could not

21   have done so because he was in Green Bay, Wisconsin, visiting his children that week."

22   (Opinion at 12; RT at 2268-84.) Because this testimony had only a neutral effect on the

23   prosecution's case against petitioner, there is no reasonable possibility that the communication

24   influenced the verdict. Accordingly, any misconduct arising from the failure of Juror #4 to

25   inform the court earlier of her contact, if any, with witness Rodney McClish outside the

26   courtroom could not have had a substantial and injurious effect or influence on the verdict and

1  was therefore harmless.  Brecht, 507 U.S. at 737.[15]

2          4.  Evidentiary Hearing

3          Petitioner requests an evidentiary hearing in this court on his claims of juror

4  misconduct.   (Traverse at 3.)  Pursuant to 28 U.S.C. § 2254(e)(2), an evidentiary hearing is

5  appropriate only under the following circumstances:

6          (e)(2) If the applicant has failed to develop the factual basis of a
           claim in State court proceedings, the court shall not hold an
7          evidentiary hearing on the claim unless the applicant shows that-

8                  (A) the claim relies on-

9                  (i) a new rule of constitutional law, made retroactive to cases on
                   collateral review by the Supreme Court, that was previously
10                 unavailable; or

11                 (ii) a factual predicate that could not have been previously
                   discovered through the exercise of due diligence; and
12
                   (B) the facts underlying the claim would be sufficient to establish
13                 by clear and convincing evidence that but for constitutional error,
                   no reasonable fact finder would have found the applicant guilty of
14                 the underlying offense[.]

15         Under this statutory scheme, a district court presented with a request for an

16  evidentiary hearing must first determine whether a factual basis exists in the record to support a

17  petitioner's claims and, if not, whether an evidentiary hearing "might be appropriate."  Baja v.

18  Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999).  See also Earp v. Ornoski, 431 F.3d 1158, 1166

19  (9th Cir. 2005); Insyxiengmay v. Morgan, 403 F.3d 657, 669-70 (9th Cir. 2005). "'In deciding

20  whether to grant an evidentiary hearing, a federal court must consider whether such a hearing

21  could enable an applicant to prove the petition's factual allegations,' and whether those

22  allegations, if true, would entitle him to relief."  West v. Ryan, ___F.3d___,___, 2010 WL

23  2303337, at *6 (9th Cir. June 10, 2010) (quoting Schriro v. Landrigan, 550 U.S. 465, 474 (2007).

24
        [15]  To the extent petitioner is challenging the trial court's ruling on any of the other issues
25  raised at the hearing on petitioner's motion for new trial, any such claim should be rejected.
    Petitioner has failed to establish that any of the trial jurors committed misconduct resulting in
26  prejudice.

1  "Furthermore, because AEDPA's deferential standards "control whether to grant habeas relief, a

2  federal court must take into account those standards in deciding whether an evidentiary hearing is

3  appropriate." Id. (citations omitted).

4         This court concludes that no additional factual supplementation is necessary with

5  respect to petitioner's claims of juror misconduct.  As described above, the trial court held an

6  extensive hearing on petitioner's allegations of jury misconduct.  Indeed, the state trial court

7  heard testimony from almost every juror who participated in petitioner's trial.  Although Juror

8  #10 did not testify, his testimony was not necessary in order to resolve petitioner's claims.

9  Because petitioner did not "fail to develop the factual basis" of his claims of juror misconduct, an

10 additional evidentiary hearing is neither appropriate or necessary.  Further, for the reasons set

11 forth above, the facts alleged in support of petitioner's claims, even if established at a hearing,

12 would not entitle him to federal habeas relief.  Therefore, petitioner's request for an evidentiary

13 hearing in connection with his jury misconduct claims should be denied.

14        B.  Ineffective Assistance of Appellate Counsel

15        Petitioner's next claim is that his appellate counsel rendered ineffective assistance

16 in failing to raise his claims of juror misconduct on appeal.  (Am. Pet. at 6(f)-7(a).)  Petitioner

17 provides this court with evidence that he asked his appellate attorney to raise these issues but that

18 counsel declined to do so because he and two other attorneys whom he consulted concluded that

19 "there were no appellate issues in connection with those matters."  (Pet., Appx. A, at page

20 marked "28."))

21        Petitioner's claim of ineffective assistance of appellate counsel was raised for the

22 first time in the petitions for a writ of habeas corpus filed in the California Court of Appeal and

23 the California Supreme Court.  (Resp't's Lod. Docs. 8, 10.)  The California Court of Appeal

24 rejected petitioner's arguments on the merits.  (Resp't's Lod. Doc. 9.)  The California Supreme

25 Court denied petitioner's application with a citation to People v. Duvall, 9 Cal.4th 464, 474

26 (1995).  (Resp't's Lod. Doc. 11.)  Because the California Supreme Court rejected petitioner's

1    arguments on procedural grounds, this court will review petitioner's claim of ineffective

2    assistance of appellate counsel de novo.  Nulph 333 F.3d at 1056.

3              The Sixth Amendment guarantees the effective assistance of counsel.  The United

4    States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

5    Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

6    counsel, a petitioner must first show that, considering all the circumstances, counsel's

7    performance fell below an objective standard of reasonableness.  466 U.S. at 687-88.  After a

8    petitioner identifies the acts or omissions that are alleged not to have been the result of

9    reasonable professional judgment, the court must determine whether, in light of all the

10   circumstances, the identified acts or omissions were outside the wide range of professionally

11   competent assistance.  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  Second, a

12   petitioner must establish that he was prejudiced by counsel's deficient performance.  Strickland,

13   466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for

14   counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

15   694.  A reasonable probability is "a probability sufficient to undermine confidence in the

16   outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981

17   (9th Cir. 2000).  A reviewing court "need not determine whether counsel's performance was

18   deficient before examining the prejudice suffered by the defendant as a result of the alleged

19   deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of

20   sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949, 955

21   (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).  In assessing an ineffective assistance of

22   counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide

23   range of professional assistance.'"  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting

24   Strickland, 466 U.S. at 689).  There is in addition a strong presumption that counsel "exercised

25   acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

26   695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

1       The Strickland standards apply to appellate counsel as well as trial counsel.  Smith

2  v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).

3  However, an indigent defendant "does not have a constitutional right to compel appointed

4  counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

5  professional judgment, decides not to present those points." Jones v. Barnes, 463 U.S. 745, 751

6  (1983).  Counsel "must be allowed to decide what issues are to be pressed." Id.  Otherwise, the

7  ability of counsel to present the client's case in accord with counsel's professional evaluation

8  would be "seriously undermined." Id.  See also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th

9  Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is

10  not even particularly good appellate advocacy.")  There is, of course, no obligation to raise

11  meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88 (requiring a

12  showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing

13  to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to demonstrate prejudice in this

14  context, petitioner must show that, but for appellate counsel's errors, he probably would have

15  prevailed on appeal.  Id. at 1434 n.9.

16       For the reasons set forth above, this court has not found merit in petitioner's

17  claims of juror misconduct.  Of course, petitioner's appellate counsel had no obligation to raise

18  meritless issues on appeal.  Strickland, 466 U.S. at 687-88.  Appellate counsel's decision to raise

19  other issues that he believed, in his professional judgment, had more merit than the juror

20  misconduct claims suggested by petitioner was "within the range of competence demanded of

21  attorneys in criminal cases." McMann v. Richardson, 397 U.S. 759, 771 (1970).  Accordingly,

22  petitioner is not entitled to relief on this claim.

23       C.  Jury Instruction Error

24       Petitioner raises several claims that jury instruction error tainted the verdict

25  reached in his state court trial.  After setting forth the applicable legal principles, the court will

26  address these claims in turn below.

1    1. Legal Standards

2         A state court's determination of whether a requested instruction is proper under

3    state law cannot form the basis for federal habeas relief.  Estelle, 502 U.S. at 67-68; see also

4    Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005).  Nevertheless, a "claim of error

5    based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground

6    for federal habeas corpus relief where its impact so infects the entire trial that the resulting

7    conviction violates the defendant's right to due process."  Hines v. Enomoto, 658 F.2d 667, 672

8    (9th Cir. 1981) (quoting Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)).  See also Prantil v.

9    California, 843 F.2d 314, 317 (9th Cir. 1988) (To prevail on such a claim petitioner must

10   demonstrate that an erroneous instruction "so infected the entire trial that the resulting conviction

11   violates due process").  The analysis for determining whether a trial is "so infected with

12   unfairness" as to rise to the level of a due process violation is similar to the analysis used in

13   determining, under Brecht, 507 U.S. at 623, whether an error had "a substantial and injurious

14   effect" on the outcome.  See Thomas v. Hubbard, 273 F.3d 1164, 1179 (9th Cir. 2001), overruled

15   on other grounds by Payton v. Woodford, 299 F.3d 815, 828 n.11 (9th Cir. 2002).

16   2. Felony Murder Rule

17        Petitioner claims that the trial court violated his right to due process by giving an

18   erroneous jury instruction on the felony murder rule as to Count 1 charging the second degree

19   murder of Allen Qualls.  In this regard, petitioner argues, "by instructing the jury that it could

20   convict petitioner of murder based on two predicate offenses was a violation of his Fifth, Sixth,

21   and Fourteenth Amendment rights because both of those offenses necessarily merged with the

22   homicide."  (Am. Pet. at 7(a).)

23        The California Court of Appeal rejected these arguments on appeal, reasoning as

24   follows:

25        Defendants contend the trial court misinstructed the jury on second
     degree felony murder as to count 1.  We conclude any error was
26        harmless beyond a reasonable doubt.

Over objection, the trial court instructed the jury pursuant to CALJIC No. 8.32 on second degree felony murder as a possible basis for a second degree murder verdict on count 1, along with express malice (CALJIC No. 8.11) and implied malice (CALJIC No. 8.31). The instruction stated the predicate felonies for second degree felony murder were (1) discharging a firearm at an occupied motor vehicle or (2) grossly negligent discharge of a firearm. The court also instructed on the elements of these offenses.

Defendants assert it was error to instruct on felony murder because both alleged predicate offenses necessarily merged with the homicide. (See People v. Randle (2005) 35 Cal.4th 987; People v. Robertson (2004) 34 Cal.4th 156; People v. Ireland (1969) 70 Cal.2d 522 [disapproved in part, People v. Hansen (1994) 9 Cal.4th 300, 314].) We need not decide this point because the jury clearly did not rely on felony murder to reach its verdicts on count 1.

As shown in part III above, the jury's convictions on count 2 (attempted murder of Washington) must have been based on a finding of express malice; i.e., a specific intent to kill. This is inconsistent with merely shooting into a motor vehicle or the negligent discharge of a firearm. Under the doctrine of transferred intent, on which the jury was instructed, defendants' intent toward Washington was "transferred" to Qualls, the victim in count 1.

In Scott, supra, 14 Cal.4th 544, as here, the defendants attempted to murder one victim but instead murdered another, unintended victim. (Id. at p. 547.) As the court explained: "[A]pplication of the transferred intent doctrine is [not] under these circumstances foreclosed by the prosecutor having charged defendants with attempted murder of the intended victim. Contrary to what its name implies, the transferred intent doctrine does not refer to any actual intent that is capable of being 'used up' once it is employed to convict a defendant of a specific intent crime against the intended victim. [¶] . . . Rather, as applied here, it connotes a policy – that a defendant who shoots at an intended victim with intent to kill but misses and hits a bystander instead should be subject to the same criminal liability that would have been imposed had he hit his intended mark." (Id. at pp. 550-551.) Under that "policy," defendants' specific intent to kill Washington properly subjected them to the same criminal liability for the killing of Qualls, based on the same "transferred" intent.

Moreover, the jury could not conceivably have found defendants had different intents as to the two victims. Demarkas shot both in the same rapid sequence of events. Only chance distinguished one crime from the other. It is likely beyond a reasonable doubt that, having found the specific intent to kill as to Washington, the jury accepted the prosecutor's theory of transferred intent as to Qualls.

/////

41

1          Even assuming it was error to instruct on second degree felony
           murder, the error was harmless.
2

3    (Opinion at 24-26.)

4          In state court, petitioner argued that it was not possible to determine on which

5    theory the jury had convicted him of the second degree murder of Allen Qualls.  (Resp't's Lod.

6    Doc. 2, at 15-23.)  According to petitioner, he might have been convicted of Count 1 on an

7    invalid felony murder theory, in which case the improper instructions on felony murder violated

8    his constitutional right "to have the jury resolve, beyond a reasonable doubt, all of the elements

9    of the crimes with which he was charged."  (Id. at 22.)  As described above, the California Court

10   of Appeal disagreed, concluding "beyond a reasonable doubt" that the jury convicted petitioner

11   of the second degree murder of Qualls on a theory of transferred intent.  According to the state

12   appellate court, any error committed by the trial court in giving the felony murder instructions

13   was harmless because the jury did not rely on that theory to find petitioner guilty of Qualls'

14   murder.

15         The state court's conclusion in this regard is based on a reasonable construction of

16   the facts of this case and is not contrary to or an unreasonable application of federal law.  For the

17   reasons expressed by the California court of Appeal, petitioner's jury almost certainly convicted

18   him of the second degree murder of Allen Qualls on a theory of transferred intent and not on a

19   felony murder theory.  Accordingly, any error in instructing on felony murder with regard to

20   Count 1 was harmless.

21              3.  Attempted Murder Charge

22         Petitioner's next claim is that "because the instructions on attempted murder were

23   conflicting and confusing, the instructions considered as a whole allowed the jury to convict

24   petitioner of attempted murder based on implied malice."  (Am. Pet. at 7(a).)  Petitioner clarifies

25   that "the instructions made it appear that implied malice would be sufficient to support a guilty

26   verdict of attempted murder because of the conflicting and confusing instructions that were

42

given." (Id. at 7(a)-7(b).)

The California Court of Appeal rejected this argument on appeal, reasoning as follows:

> Defendants contend their convictions for attempted murder (count 2) must be reversed because the jury was wrongly instructed implied malice could suffice for attempted murder.  We disagree.
>
> The trial court instructed on attempted murder with CALJIC No. 8.66 as follows: "Defendants are accused in Count 2 of having committed the crime of attempted murder, in violation of Section[s] 664 and 187 of the Penal Code.  [¶]  Every person who attempts to murder another human being is guilty of violation [of] Penal Code Section[s] 664 and 187.  [¶]  Murder is the unlawful killing of a human being with malice aforethought.  In order to prove attempted murder, each of the following elements must be proved:  [¶]  One, A direct but ineffectual act was done by one person towards killing another human being and;  [¶]  *Two, The person committing the act harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being.*  [¶]  In determining whether or not such an act was done, it is necessary to distinguish between mere preparation, on the one hand, and the actual commencement of the doing of the criminal deed, on the other.  [¶] . . . [¶] . . . *[A]cts of a person who intended to kill another person will constitute an attempt where those acts clearly indicate a certain unambiguous intent to kill."*  (Italics added.)
>
> The trial court also instructed with CALJIC No. 3.31 as follows: "In the crimes charged in Counts 1 and 2 and the lesser crimes within Counts 1 and 2 or the specific intent to commit the underlying felony crimes for second degree felony murder or the crime of conspiracy to commit murder and the allegation of personal use of a firearm, *there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of [the] perpetrator.  [¶]  Unless this specific intent exists, the crime or allegations to which it relates is not committed or is not true.  [¶]  The specific intent required is included in the definition of crimes or allegations setforth [sic] elsewhere in these instructions."*  (Italics added.)
>
> In addition, the trial court instructed with CALJIC No. 2.02 as follows: "The specific intent or mental state with which an act is done may be shown by the circumstances surrounding the commission of the act.  *However, you may not find the defendants guilty of the crimes charged in Counts One and Two,* and the lesser crimes within Counts One and Two, or the specific intent to commit the underlying felony crimes for second degree felony murder, or the crime of conspiracy to commit murder and the

allegation of personal use of a firearm to be true, *unless the proved circumstances are not only, one, consistent with the theory that the defendant had the required specific intent or mental state, but two, cannot be reconciled with any other rational conclusion.* [¶] Also, if the evidence as to specific intent or mental state permits two reasonable interpretations, one of which points to the existence of the specific intent or mental state and the other to its absence, you must adopt that interpretation which points to its absence. If, on the other hand, one interpretation of the evidence as to the specific intent or mental state appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable." (Italics added.)

Defendants cannot and do not contend these instructions were incorrect. (Cf. People v. Guerra (1985) 40 Cal.3d 377, 386; CALJIC (2006) Use Note to No. 8.66, p. 400 [recommending these instructions be given together.) They maintain, however, that the jury could have been confused because: (1) Before giving CALJIC No. 8.66, the trial court had instructed that the malice aforethought required for murder may be either express or implied (CALJIC Nos. 8.10, 8.11). (2) Before giving CALJIC No. 8.66, the trial court also gave CALJIC No. 8.50, which explains that malice distinguishes murder from manslaughter. (3) The trial court also instructed the jury to consider the instructions as a whole and not to consider the order in which they were given (CALJIC No. 1.01). We are not persuaded.

As defendants concede, we must presume the jury understood and correctly applied the instructions. (People v. Mickey (1991) 54 Cal.3d 612, 689, fn. 17.) Defendants' claim it could not have done so is speculation.

Defendants also rely on People v. Lee (1987) 43 Cal.3d 666 (Lee), which held it is error to instruct on implied malice as to attempted murder. (Id. at p. 670.) Lee does not aid defendants. There, attempted murder was the only crime of homicide charged; thus, implied malice should not have been mentioned. (Id. at pp. 668, 670-671.) Here, because murder was also charged, the trial court had to instruct on implied malice as to that count. But it did not make the mistake of the trial court in Lee: as noted, it correctly instructed that for attempted murder the specific intent to kill was required.

Defendants have not shown error on this point.

(Opinion at 21-24.)

In state court, petitioner argued that the "conflicting or inadequate instructions on intent . . . are closely related to instructions that completely remove the issue of intent from the

jury's consideration, and, as such, they constitute federal constitutional error." (Resp't's Lod. Doc. 2 at 32.)  When challenging an ambiguous or confusing jury instruction, a petitioner must establish a reasonable likelihood that the jury applied the challenged instruction in a way that violates the Constitution.  Estelle, 502 U.S. at 72.  A jury instruction that relieves the prosecution of the burden of proving criminal intent, with respect to a crime that requires criminal intent, violates a defendant's right to due process.  Sandstrom v. Montana, 442 U.S. 510, 520-21 (1979). The question here is whether there is a reasonable likelihood the jury applied the jury instructions set forth above in such a way as to relieve the prosecution of its burden of proving specific intent with respect to the attempted murder of Washington.

As the California Court of Appeal recognized, the jury in this case was specifically instructed that a finding of specific intent to kill was required in order to find the defendants, including petitioner, guilty of attempted murder.  This court must presume that the jury followed these instructions unless there is admissible evidence to the contrary.  Penry, 532 U.S. at 799; Weeks v. Angelone, 528 U.S. 225, 234 (2000); Richardson v. Marsh, 481 U.S. 200, 211 (1987).  There is no evidence in the record before this court indicating that the jury was confused or that they disregarded the instructions in this regard.  Petitioner has failed to show that the jury applied the instructions improperly.

Because petitioner has not demonstrated that the decision of the California Court of Appeal rejecting this jury instruction claim was contrary to or an unreasonable application of federal law, he is not entitled to federal habeas relief on this claim.

### 4. Imperfect Self Defense

Petitioner claims that erroneous jury instructions were given with respect to "imminent peril" in connection with his defense of imperfect self-defense violated his right to due process.  (Am. Pet. at 7(b).)  The California Court of Appeal rejected this argument, reasoning as follows:

/////

Defendants contend the trial court erred in instructing the jury on imminent danger in connection with imperfect self-defense.  There was no error.

The trial court instructed pursuant to CALJIC No. 5.17: "A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury kills unlawfully, but does not harbor malice aforethought and is not guilty of murder.  [¶]  This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief.  [¶]  Such an actual but unreasonable belief is not a defense to the crime of voluntary manslaughter.  [¶]  As used in this instruction, an imminent peril or danger means one that is apparent, present, immediate and must be instantly dealt with or must so appear at the time to the slayer.  [¶]  However, this principle is not available and malice aforethought is not negated, if the defendant by his unlawful or wrongful conduct created the circumstances which legally justified his adversary's use of force[,] attack[,] or pursuit.  [¶]  This principle applies equally to a person who kills in purported self-defense or purported defense of another."

At the prosecutor's request, the trial court also instructed over objection:  "Fear of future harm no matter how great the fear and no matter how great the likelihood of the harm will not suffice.  [¶]  The defendant's fear must be of imminent danger to life or great bodily injury.  [¶]  The peril must appear to the defendant as immediate and present and not prospective or even in the near future.  An imminent peril is one that, from appearances, must be instantly dealt with."  This language correctly states the law; it comes directly from In re Christian S. (1994) 7 Cal.4th 768, 783.  (See also People v. Rodriguez (1997) 53 Cal. App.4th 1250, 1269.)

Defendants complain this instruction was superfluous because CALJIC No. 5.17 fully covered the subject, and to give it "unduly emphasized this point and in doing so suggested that the jury look with some skepticism at whether this element existed."  We disagree.  The additional instruction correctly stated the law and clarified the point at issue.  (See People v. Freeman (1994) 8 Cal.4th 450, 505 [no error in giving correct but overlapping instructions].)

So far as defendants assert the instruction conflicts with CALJIC No. 5.17, we reject the assertion.  Defendants claim the instruction's phrase "from appearances" wrongly sets up an objective standard for judging the imminence of peril.  However, the preceding sentence states: "The peril must appear to the defendant as immediate [etc.]."  There is no conflict with CALJIC No. 5.17.

Defendants have shown no error on this point.

46

1   (Opinion at 26-28.)

2          Petitioner's claim in this regard is focused primarily on the interpretation of

3   California law and does not rise to the level of a cognizable federal habeas claim.  Estelle, 502

4   U.S. at 68.  Petitioner has failed to cite any authority for the proposition that the trial court's

5   giving of this additional instruction on "imminent peril" violated his right to due process.  This

6   instruction simply clarified for the jury the meaning of the term "imminent peril."  The

7   instruction was not erroneous under state law and it did not render petitioner's trial

8   fundamentally unfair.

9          Petitioner also contends that the giving of CALJIC No. 5.17 "compounded the

10  error because it contains a prejudicial defect in that it provides that any 'wrongful' conduct

11  disallows the defense."  (Am. Pet. at 7(b).)  Petitioner notes that he testified at trial that he

12  believed one of the victims "was about to shoot him and that he also feared for his family."  (Id.)

13  Petitioner points out that there was evidence presented at trial that both of the victims had

14  invaded his home, assaulted him, and endangered his family.  (Id.)  Petitioner argues that, "there

15  was substantial evidence to support an imperfect self defense theory."  (Id. at 7(b)-7(c).)

16         On appeal, the California Court of Appeal rejected these arguments as well,

17  reasoning as follows:

18             Defendants separately contend that CALJIC No. 5.17 is legally
               erroneous because it makes imperfect self-defense available only to
19             persons who have committed no wrongdoing.  This claim lacks
               merit.
20
               Defendants see a clash between the teaching of CALJIC No. 5.17
21             that a defendant may not claim imperfect self-defense if "by his
               unlawful or wrongful conduct [he] created the circumstances which
22             legally justified his adversary's [response]" and the following
               footnote from In re Christian S., supra, 7 Cal.4th 768:  "It is well
23             established that the ordinary self-defense doctrine . . . may not be
               invoked by a defendant who, through his own wrongful conduct
24             (e.g., the initiation of a physical assault or the commission of a
               felony), has created circumstances under which his adversary's
25             attack or pursuit is legally justified.  [Citation.]  It follows, a
               fortiori, that the imperfect self-defense doctrine cannot be invoked
26             in such circumstances.  For example, the imperfect self-defense

                                                47

1      doctrine would not permit a fleeing felon who shoots a pursuing
    police officer to escape a murder conviction even if the felon killed
2      his pursuer with an actual belief in the need for self-defense." (Id.
    at p. 773, fn. 1; italics added.)  Defendants read this footnote to
3      mean that only a heightened level of wrongdoing deprives a
    defendant of imperfect self-defense, not merely "unlawful or
4      wrongful conduct" as stated in CALJIC No. 5.17.  Defendants are
    wrong.

    The quoted footnote does not purport to list all the kinds of
6      wrongdoing that would bar imperfect self-defense; on the contrary,
    it uses the expressions "e.g." and "[f]or example."  It does plainly
7      say, however, that any wrongdoing that creates the circumstances
    that legally justify the adversary's response will bar imperfect
8      self-defense.  That is exactly what CALJIC No. 5.17 says.  The
    instruction correctly states the law.

    The trial court did not err by instructing with CALJIC No. 5.17.

11  (Opinion at 28-29.)

12      Petitioner's argument in support of this claim once again concerns the

13  interpretation of state law which cannot provide the basis for a cognizable claim in this federal

14  habeas corpus proceeding.  Petitioner has failed to demonstrate, or cite any authority for the

15  proposition, that the giving of CALJIC No. 5.17 violated his right to due process.  Accordingly,

16  petitioner is not entitled to federal habeas relief with respect to these jury instruction error claims.

17                         CONCLUSION

18      Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ

19  of habeas corpus be denied.

20      These findings and recommendations are submitted to the United States District

21  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

22  one days after being served with these findings and recommendations, any party may file written

23  objections with the court and serve a copy on all parties.  Such a document should be captioned

24  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

25  shall be served and filed within fourteen days after service of the objections.  Failure to file

26  objections within the specified time may waive the right to appeal the District Court's order.

1   <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir.

2   1991).  In his objections petitioner may address whether a certificate of appealability should issue

3   in the event he files an appeal of the judgment in this case.  <u>See</u> Rule 11, Federal Rules

4   Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

5   when it enters a final order adverse to the applicant).

6   DATED: July 6, 2010.

7

8   _____

9   DALE A. DROZD
    UNITED STATES MAGISTRATE JUDGE

10  DAD:8
    king1524.hc

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26